IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH BROWN, LOUIS WEISBERG,
and STEPHANIE LOSSE,

                             Plaintiffs,

    v.

JEFFREY L. KEMP, CHARLES SIMONO,
MARK FRUEHAUF, ANGELINE E. WINTON,
KIMBERLY LAWTON, KELLY McKNIGHT,
MARTHA MILANOWSKI, WILLIAM NORINE,
ANGELA L. BERANEK, BRUCE R. POQUETTE,
MATTHEW TINGSTAD, MICHAEL NIESKES,
SCOTT K. WALKER, BRAD D. SCHIMEL,
CATHY L. STEPP and TODD A. SCHALLER, all
sued in their official capacities,

                            Defendants.

OPINION AND ORDER

17-cv-549-wmc

Plaintiffs Joseph Brown, Louis Weisberg, and Stephanie Losse challenge the constitutionality of an amendment to Wisconsin Statute § 29.083, which prohibits a person from interfering with or attempting to interfere with "activity associated with lawful hunting, fishing or trapping." More specifically, plaintiffs claim that after being amended in 2015 to include two or more acts of maintaining a "visual proximity" to, "approaching," or creating visual or audio of someone engaged in those activities, this prohibition is now overbroad, vague and chills lawful expression in violation of the First Amendment. Before the court are the parties' cross motions for summary judgment. (Defs.' Mot. (dkt. #19); Pls.' Mot. (dkt. #30).) For the reasons that follow, the court will grant defendants' motion for summary judgment, finding that: (1) plaintiffs lack standing to bring an as-applied challenge; and (2) plaintiffs' facial challenges fail as a matter of law.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiffs Joseph Brown, Louis Weisberg and Stephanie Losse are Wisconsin residents who have monitored and wish to continue monitoring Wisconsin hunting activity through visual observation, as well as photographic and video documentation. Moreover, plaintiffs plan to use information and imagery gathered in this way to educate the public about the nature of hunting in Wisconsin, particularly wolf hunting.

Plaintiff Joseph Brown is an Assistant Professor at Marquette University in Milwaukee, Wisconsin, who creates documentary films, including films that discuss the pros and cons of Wisconsin wolf hunting. Some of Brown's work is done in affiliation with "Wolf Patrol," an organization that seeks to monitor compliance with hunting and trapping laws and to document hunting activity for public dissemination. Plaintiff Louis Weisberg is the Publisher and Editor-in-Chief of the *Wisconsin Gazette*, a newspaper based in Milwaukee. Through his work at the *Gazette*, Mr. Weisberg has published articles about hunting in Wisconsin, as well as advocated on behalf of the wolf population. To gather information for his publications, Weisberg sends individuals to hunting grounds to observe and take photographs. Finally, plaintiff Stephanie Losse is an environmental and animal rights advocate who volunteers with Wolf Patrol.

Defendants are or were employees of the state of Wisconsin, all sued in their official capacity, including District Attorneys Jeffrey L. Kemp (Polk County), Charles Simono

---

[1] Unless otherwise noted, the court finds the following facts material and undisputed.

(Forest County), Mark Fruehauf (Douglas County), Angeline E. Winton (Washburn County), Kimberly Lawton (Bayfield County), Kelly McKnight (Ashland County), Martha Milanowski (Vilas County), William Norine (Burnett County), Angela L. Beranek (Barron County), Bruce R. Poquette (Sawyer County), Matthew Tingstad (Iron County), and Michael E. Nieskes (St. Croix County). The other defendants are former Wisconsin officials: then Governor Scott K. Walker, then Attorney General Brad D. Schimel, then Wisconsin Department of Natural Resources ("DNR") Secretary Cathy L. Stepp and then DNR Chief Warden Todd A. Schaller.

## B. Statutory History

In 1990, the Wisconsin legislature enacted Wisconsin Statute § 29.223 (1989-90) (later renumbered as § 29.083) in response to ongoing conflicts between non-tribal individuals attempting to prevent members of the Chippewa tribes of Wisconsin from exercising their treaty rights to hunt and fish. (Defs.' PFOFs (dkt. #21) ¶¶ 28-30.) This so-called "hunter harassment law" was intended to enable wardens to deal more effectively with interference in lawful hunting or fishing activities. (*Id*. ¶¶ 31-32.) The original hunter harassment law prohibited interference or attempted interference in "lawful hunting, fishing or trapping with the intent to prevent the taking of a wild animal" by directly harassing animals, impeding or obstructing persons engaged in lawful hunting, fishing, or trapping (or associated activities), or disturbing property of persons engaged in the same. 1989 Wisconsin Act 190 (1990); Wis. Stat. § 29.223(2)(a). The law created fines for violations, but in addition to enforcement by DNR and other law enforcement officials, the statute provided a civil action for injunctive relief and/or damages by a "person who is

3

adversely affected by, or who reasonably may be expected to be adversely affected by conduct that in violation of sub. (2)(a)."  1989 Wisconsin Act 190 (1990); Wis. Stat. § 29.223(4)(a); Wis. Stat. § 29.99(11r)(a).

In 1991, the state cited three individuals for interfering with Chippewa tribal members' spearfishing.  (Defs.' PFOFs (dkt. #21) ¶ 36.)  In that case, *State v. Bagley*, 164 Wis. 2d 255, 474 N.W.2d 761 (Ct. App. 1991), the Wisconsin Court of Appeals rejected the Bagley party's claim that the hunter harassment law was unconstitutionally overbroad and vague.  The court construed the words "interfere," "obstruct" and "impede" to mean that the statute was limited to physical interference; it further held that this construction, along with the affirmative defense of free speech, prevented the statute from reaching protected speech.  *Bagley*, 164 Wis. 2d at 263-65.  The court also held that the statute was not unconstitutionally vague because the defendants had notice of the prohibited conduct. *Id*. at 265-66.  Finally, the court explained that although what constituted preparatory acts could not be precisely defined, it presented a question of fact because of the great variety of acts that can be involved in preparation for hunting or fishing, "depending on the type or manner of hunting or fishing involved."  *Id*. at 267.

Since *Bagley*, the law has been applied regularly to conflicts between hunters, between landowners and hunters, and between landowners and fisherman.  (Defs.' PFOFs (dkt. #21) ¶ 42.)  Common examples of interactions include individuals or groups "actively trying to prevent another individual or group from taking game or fish," landowners "honking car horns, throwing rocks, or discharging firearms to prevent the taking of fish or game, or to dissuade" people from hunting or fishing in the area, and non-hunters

4

destroying "lawfully placed bait."  (*Id*. ¶¶ 43-46.)

After the state began permitting limited wolf hunting in 2012, advocates against that hunting began "monitoring" hunters, including photographing, filming, and following hunters, and blocking trails.  On at least one occasion, wolf hunters were followed home and photographs of their vehicles and license plates were posted online, resulting in threats to the hunters and their property.  (*Id*. ¶¶ 63-71.)  These activities resulted in increased confrontations between wolf hunters and "monitors," as well as calls to law enforcement asserting violations of the hunter harassment law.  (*Id*. ¶¶ 73-75.)  During one incident in particular, in July 2015 wolf hunters in Polk County called the Sheriff's Department to report that plaintiff Losse and other individuals associated with the Wolf Patrol were harassing hunters by filming and videotaping them.  (*Id*. ¶ 77.)  The Sheriff's Department informed the Wolf Patrol that they would be cited for their conduct, although no individuals were ever actually cited or prosecuted related to the incident.  (*Id*. ¶¶ 78-80.)

In October 2015, the Wisconsin Legislature began reviewing proposed amendments to bolster the hunter harassment law.[2]  (*Id*. ¶ 82.)  Modeled after an anti-stalking statute, the main provision to be added (subsection 29.083(2)(a)7 prohibited "engaging in a series of 2 or more acts . . . that are intended to impede or obstruct a person who is engaged in

---

[2] Plaintiffs highlight comments by legislators such as Representative Adam Jarchow.  (Compl. (dkt. #1) ¶¶ 111-13 ("With all the unnecessary ruckus [caused by groups like Wolf Patrol], an entire day of hunting could be ruined by people that just don't believe in what someone else is legally doing"; and "If people would respect others' rights, [this legislation] wouldn't have to be [written]. However, there is a group of extremist anti-hunters out there who seem to enjoy making hunters' lives miserable.").)  As proof that the law is not content and viewpoint neutral, plaintiffs rely on the timing of the amendment relative to the Polk County incident.  (*Id*. ¶¶ 114, 116-17.)  However, the comments by Rep. Jarchow and others are not enough to support their claim for the reasons discussed below.

lawful hunting, fishing, or trapping, or an activity associated with lawful hunting, fishing, or trapping." (*Id*. ¶ 84.)  The specific prohibited acts include:

    a.  Maintaining a visual or physical proximity to the person.

    b.  Approaching or confronting the person.

    c.  Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person.  This subd. 7.c. applies regardless of where the act occurs.

    d.  Causing a person to engage in any of the acts described in subd. 7.a. to c.

(*Id*.)  The amendment further expanded the definition of "activity associated with lawful hunting, fishing, or trapping" to include "scouting, target shooting, dog training, animal baiting or feeding."  2015 Wisconsin Act 346, Section 1 (2016).  Finally, the amended prohibitions include using a drone for the activities listed in 7.a. to c.  (*Id*.)  To address concerns that the proposed amendment may prohibit activities *not* intended to interfere with hunting activity, the Legislature also added a requirement of intent.  (*Id*. ¶¶ 85-89.)

Both the original and amended versions of § 29.083 also contain the following affirmative defense:

> **(3m) Affirmative defense.** It is an affirmative defense to the prosecution for violation of this section if the defendant's conduct is protected by his or her right to freedom of speech under the constitution of this state or of the United States.

Wis. Stat. § 29.083(3m).  The amendment ultimately passed and became effective on April 4, 2016.

### C. Plaintiffs' Alleged Injury

As the publisher of the *Wisconsin Gazette*, plaintiff Weisberg avers that he fears sending journalists into the field because the statute makes it a crime to "caus[e] a person to engage in any of the acts described [in the statute]."  (Weisberg Decl. (dkt. #35) ¶ 3 (citing Wis. Stat. § 29.083(2)(7.d)).  Plaintiff Losse further avers that she was stopped by hunters on public grounds, who accused her of harassment in violation of Wisconsin law. Similarly, some hunters called law enforcement to the scene, who also advised that she was violating a Wisconsin statute and would receive a citation, although she was never actually issued one.  Finally, plaintiff Brown is currently working on a feature film, which he intends to screen on the film festival circuit when finished.  To date, he has amassed over 300 hours of documentary footage of wolf, coyote, bear, and bobcat hunting activities in Northern Wisconsin, but Brown avers that while he wishes to continue these activities, he has refrained from doing so for fear of civil and criminal liability under the Statute.

While filming with the Wolf Patrol from some distance away, Brown specifically represents that hunters have become irate and approached his crew, demanding that they turn over the footage.  One hunter, presumably alluding to § 29.083, even told Professor Brown that "You cannot legally videotape a hunt in Wisconsin."  (Brown Decl. (dkt. #33) ¶ 8.)  While filming and monitoring hunting activity, Brown and Losse both further represent that they have been surrounded by groups of hunters who used their vehicles to prevent them from passing through on a public road, waiting for law enforcement to arrive. On one occasion, a responding local law enforcement officer -- *not* a state employee, and even more specifically, not a DNR employee charged with enforcing § 29.083 -- questioned

Brown and Wolf Patrol volunteers for over an hour.  On another occasion, on January 27, 2018, hunters confronted Brown and other Wolf Patrol volunteers on a public road, barricaded them with their trucks, berated them, and threatened to beat them up and to run them over.  When officers from the Forest County Sheriff's Department arrived, the officers also seized Brown's camera equipment and all his stored footage, including three professional video cameras, a digital camera, his cellphone and two SD cards, and searched these items.  A search warrant, issued twelve days later by a state circuit court judge, even cited a possible violation of § 29.093 as grounds for the search and seizure of Brown's equipment and footage.

While his equipment has since been returned, Brown represents that he has yet to receive his memory cards, although Forest County District Attorney Charles J. Simono avers that his office (1) provided copies of the materials stored on the media cards to Brown at the request of his attorneys and (2) advised the Sheriff's Department that it could release the original evidence to Brown after a decision was made not to prosecute him.  (Simono Decl. (dkt. #42) ¶¶ 9-11.)  Brown further avers that the "specter of potential criminal prosecution continues to hang over his head" (Brown Decl. (dkt. #3) ¶ 5), albeit not with respect to the January 2018 event since, as defendants point out, D.A. Simono made the decision not to prosecute Brown by August 2018.  (*Id.* ¶ 11.)  Indeed, to date, no plaintiff has been arrested, cited, prosecuted or convicted under Wis. Stat. § 29.083 as amended in April 2016; nor are plaintiffs aware of any other individual who has been arrested, cited, prosecuted or convicted under the amended statute.  In response to hunters seeking to have law enforcement officers enforce the statute, as well as concerns raised by Wolf Patrol

8

members as to whether their filming or photographing hunters would violate the statute, DNR officials have further informed both groups that simply filming or photographing hunters would not violate the statute.  Still, both Losse and Brown represent that they have self-regulated their First Amendment activities for fear of civil or criminal liability under the amended statute.

Finally, on June 20, 2017, DNR officials met with District Attorneys and federal and state law enforcement officers in Bayfield County to address the Wolf Patrol's concerns.  The meeting attendees reviewed videos taken by Wolf Patrol members displaying their interactions with hunters.   Those in attendance agreed that the conduct of Wolf Patrol members in the videos did not constitute interference with hunting, fishing, or trapping, and, therefore, did not violate § 29.083.  Following the meeting, Wolf Patrol's founder Rob Cornado, who attended the meeting, stated in a video message that:  "Our concerns were answered.  We got confirmation from all three agencies present that what they've seen Wolf Patrol do is not illegal."  (Defs.' PFOFs (dkt. #21) ¶ 103.)   DNR guidance further confirms that there must be intent to interfere.

## OPINION

The parties filed cross motions for summary judgment with respect to plaintiffs' three issues on standing to bring an as-applied challenge.  The parties have also briefed three facial challenges to § 29.083 regarding:  (a) the role of the section's First Amendment affirmative defense; (b) facial overbreadth; and (c) vagueness.  The court will address each of these issues in turn.

## I.  Plaintiffs' Standing to Assert an As-Applied Challenge

The "irreducible constitutional minimum" of Article III standing requires the party

invoking federal jurisdiction to bear the burden of establishing three elements:

> First, the plaintiff must have suffered an injury-in-fact—an
> invasion of a legally protected interest which is (a) concrete
> and particularized and (b) actual or imminent, not conjectural
> or hypothetical.  Second, there must be a causal connection
> between the injury and the conduct complained of—the injury
> has to be "fairly trace[able] to the challenged action of the
> defendant, and not the result of the independent action of
> some third party not before the court."  Third, it must be
> "likely," as opposed to merely "speculative," that the injury will
> be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "The party invoking federal

jurisdiction bears the burden of establishing standing."  *Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 158 (2014).

Defendants argue that plaintiffs are unable to establish the first requirement for

standing -- the injury-in-fact -- given that § 29.083 has never been enforced against them.

As the United States Supreme Court acknowledged in *Susan B. Anthony List*, however, the

U.S. Constitution permits "pre-enforcement review under circumstances that render the

threatened enforcement sufficiently imminent." *Id.* at 159.  Still, in such circumstances,

the Court has required a plaintiff to demonstrate at least "'[1] an intention to engage in a

course of conduct arguably affected with a constitutional interest, [2] proscribed by a

statute, and [3] there exists a credible threat of prosecution thereunder.'" *Id.* (quoting

*Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

As for the first of these pre-enforcement, standing requirements, plaintiffs have

sufficiently demonstrated their intent to engage in filmmaking, photographing and

newspaper reporting of hunting, in particular, wolf hunting.  Furthermore, "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). (*See also* Defs.' Reply (dkt. #50) (acknowledging that plaintiffs' filming and photography are covered by the First Amendment).) However, plaintiffs' ability to demonstrate standing falters at the second and third requirements for pre-enforcement standing.  Specifically, plaintiffs have not put forth evidence to demonstrate that their conduct is "'arguably . . . proscribed by [the] statute' they wish to challenge," nor that the "threat of future enforcement . . . is substantial." *Susan B. Anthony List*, 573 U.S. at 162, 164.  A brief review of cases where the Supreme Court and the Seventh Circuit have found standing to bring pre-enforcement challenges illustrates what is lacking in the record before this court.

For example, in *Susan B. Anthony List*, the Supreme Court considered whether a "pro-life advocacy organization" had standing to bring a pre-enforcement challenge to an Ohio statute that prohibits "certain 'false statement[s]' 'during the course of any campaign for nomination or election to public office or office of a political party.'" 573 U.S. at 152, 153.  In finding that plaintiff's intended conduct was "arguably . . . proscribed by [the] statute," the Court relied on the fact that:  (1) an Ohio Election Commission panel had already found probable cause to believe that the plaintiff violated the statute in accusing a

11

congressional candidate of supporting "taxpayer-funded abortion" by supporting the Affordable Care Act; and (2) the organization intended to make similar statements about other candidates in the future. *Id.* at 162. Moreover, to bolster its conclusion that the risk of enforcement was "substantial," the Court emphasized that the plaintiff had already been the subject of a complaint (even though it was later dismissed), explaining "that past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Steffel v. Thompson*, 415 U.S. 452 (1974), the Supreme Court considered whether the plaintiff had standing to challenge a Georgia criminal trespass law, where he had already been threatened by the police with arrest for distributing anti-Vietnam War handbills on the exterior sidewalk of a Georgia shopping center. In finding that the plaintiff had standing to bring a pre-enforcement challenge, the Court relied on this express threat and the fact that the plaintiff's companion, who remained after being threatened with arrest, had actually been arrested and arraigned on a charge of criminal trespass. Finally, the parties in suit stipulated that if the plaintiff "returned and refused upon request to stop handbilling, a warrant would be sworn out and he might [also] be arrested and charged with a violation of the Georgia statute." *Id.* at 456-57, 459.

Likewise, in *Babbit v. United Farm Workers National Union*, 442 U.S. 289 (1979), the Court concluded that a farmworkers' union, its agent, a union supporter, and farmworkers themselves had standing to challenge certain restrictions on consumer publicity in the Arizona Agricultural Employment Relations Act, in part based on the fact that the union planned on engaging consumers in its protests and "the State has not disavowed any

12

intention of invoking the criminal penalty provision against unions that commit unfair labor practices." *Id.* at 302.  In contrast, the Court concluded that plaintiffs *lacked* standing to challenge an "access provision" of the statute, because it was wholly "conjectural to anticipate that access will be denied," since it could "only hypothesize that such an event will come to pass, and it is only on this basis that the constitutional claim could be adjudicated at this time." *Id.* at 303-04.

More recently, in *Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012), the Seventh Circuit found a nonprofit organization had standing to raise a pre-enforcement challenge to an Illinois campaign finance disclosure requirement based on its "objectively well-founded" fear of prosecution.  Specifically, the court emphasized that the Illinois Attorney General and members of the Board of Elections have "not denied that the Center's past out-of-state 'issue ads' could qualify as electioneering communications under the Illinois disclosure laws," and "there is a sufficiently realistic possibility that the [organization] would be subject to Article 9's registration and reporting requirements if it engaged in the type of political advocacy it often does and wishes to in Illinois." *Id.* at 474-75.  In so holding, the Seventh Circuit contrasted the case with an earlier Seventh Circuit decision from 1998, in which it held that Wisconsin Right to Life, Inc., lacked standing to pursue a pre-enforcement challenge to Wisconsin's political committee registration requirements. *See Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183 (7th Cir. 1998)

In this case, the facts align more closely to the speculative enforcement of the access provision before the Supreme Court in *Babbit* and the registration requirement before the Seventh Circuit in *Wisconsin Right to Life* than to the other examples discussed above in

which both courts found affirmatively expressions of defendant's intent to enforce or refusal to disavow enforcement and substantial likelihood of the plaintiff committing the prohibited act. In holding that the plaintiffs lacked a sufficiently well-founded fear of being subject to the registration regulation in particular, the Seventh Circuit relied on successive advisory opinions issued by the Wisconsin Attorney General and regulations promulgated by the state election board that had already clarified the scope of the statute's application by establishing that the definition of "political committee" did *not* apply to groups like the plaintiff. *Id.* at 1185. The court acknowledged that plaintiff may have "genuine apprehension about what lies ahead," but characterized the lawsuit as an attempt "to resolve a controversy that has not yet arisen and may never arise." *Id.* at 1187-88. So, too, in *Babbit*, the Supreme Court was presented with no evidence that the plaintiff would be denied access, nor even that Arizona refused to say either way.

Here, DNR officials, District Attorneys *and* both federal and state law enforcement agreed the conduct that produced the Wolf Patrol videos did *not* constitute interference with hunting, fishing, or trapping and, therefore, did not violate § 29.083. Moreover, following his participation in a public meeting to address all sides' concerns, Wolf Patrol's founder Rob Cornado stated in a video message that: "Our concerns were answered. We got confirmation from all three agencies present that what they've seen Wolf Patrol do is not illegal." (Defs.' PFOFs (dkt. #21) ¶ 103.) Finally, subsequent DNR guidance *confirmed* that there must be an actual intent to interfere in hunting, fishing and trapping order to violate the statute, and plaintiffs have never indicated in word or action that they have such an intent. Rather, their expressed intent is to *document* those very activities.

14

Still, plaintiffs persist that the government assurances of non-enforcement do not defeat their standing, even in the face of contrary legal authority.  Indeed, even the cases plaintiffs argue support their standing are distinguishable because the statutes expressly prohibited plaintiff's conduct at issue and the threat of prosecution was, at the very least, "latent in the existence of the statute."  *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003); *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1168 (9th Cir. 2018) (direct threat of prosecution not required where statute expressly covered the subject conduct and "the threat is latent in the existence of the statute"); *United States v. Stevens*, 559 U.S. 460, 480 (2010) (refusing to "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly" where conviction for displaying dogfighting clearly fell within the depiction of "wound[ing]" prohibited by the statutes); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 592 (E.D. Wis. 2011) (relying in part of the threat to prosecution being "latent in the existence of the statute" to find plaintiff's claim not moot).[3]  In contrast, as discussed above, plaintiffs' conduct here is neither expressly covered by the statute nor is the threat of prosecution latent in the statute.  In particular, plaintiffs have failed to direct the court to a clear, or even arguable, indication that their conduct of filming, photographing or observing hunting violates the statute without proof of their intent to interfere with activity associated with lawful hunting, fishing or trapping.

In finding that plaintiffs lack standing to bring an as applied challenge, the court

---

[3] Similarly, in *Animal Legal Defense Fund v. Kelly*, No. 18-2657-KHV (D. Kan. Jan. 22, 2020), the court relied on finding that the intended conduct violated the express terms of the statute in concluding that the plaintiffs had standing to bring a pre-enforcement challenge to *some* of the provisions of the Kansas Farm Animal and Field Crop and Research Facilities Protect Act.  (*See* dkt. #58-1 (submitted by plaintiffs as supplemental authority).)

also agrees with defendants' assertion that this effectively closes the door to any content or viewpoint-based challenges.  In response, plaintiffs argue that a facial challenge should still be allowed "when there is alleged unconstrained authority."  (Pls.' Opp'n (dkt. #44) 16.)  Unfortunately for plaintiffs, however, the cases cited in support all involve "licensing schemes that 'ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity.'"  *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989) (quoting *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755 (1988)).[4]  As the Seventh Circuit explained in *Southworth v. Board of Regents of University of Wisconsin System*, 307 F.3d 566 (7th Cir. 2002), a case in which the court extended the "unbridled discretion standard of permit and licensing cases" to a mandatory fee system, facial challenges are warranted in this narrow context because of unique "risks to free expression—the risk of self-censorship and the risk that the licensing official, not limited by express standards, will use his power to suppress speech."  *Id.* at 576, 580 (discussing *Lakewood*, 486 U.S. at 575-58). Here, other than citing these cases, plaintiffs have failed to develop any argument explaining (nor can this court discern) how this case falls within the "unbridled discretion" line of cases in which courts have defined a narrow basis to assert a facial content or viewpoint-based challenged.

---

[4] Plaintiff also cites to *Cox v. State of Louisiana*, 379 U.S. 536 (1965), but this was an appeal of a criminal conviction, and it contains no discussion of whether a facial challenge would be appropriate based on content or viewpoint challenges.  Plaintiffs' citation to *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983), is equally confusing, since that opinion has *no* mention of a facial challenge, and in fact, the union in that case challenged the bargaining agreement after suffering an actual injury by being excluded from the school district's intraschool mailing system.

16

## II.  Other Facial Challenges

The court's holding that plaintiffs lack standing to bring an as-applied challenge does not necessarily close the door to *all* facial challenges.  In particular, plaintiffs may assert facial challenges on vagueness and overbreadth grounds.  *See Ctr. for Individual Freedom v. Madigan,* 697 F.3d 464, 479 (7th Cir. 2012) (recognizing facial challenges to vague or overbroad statutes having a "substantial effect on constitutionally protected activity").  Before turning to those two challenges, the court will address defendant's argument that the Statute's First Amendment "affirmative defense" provision insulates it from such a challenges.

### A.  First Amendment Affirmative Defense

As explained above, subsection 3m of the Hunter Harassment Act states:

> It is an affirmative defense to the prosecution for violation of this section if the defendant's conduct is protected by his or her right to freedom of speech under the constitution of this state or of the United States.

Wis. Stat. § 29.083(3m).  Defendants point to the Wisconsin Court of Appeals' reliance on this provision in upholding the constitutionality of the Act in *Bagley*.  Moreover, given that the Wisconsin Legislature did not amend the provision in 2016 in light of the holding in *Bagley*, defendants further argue that the "legislature clearly intended to exclude protected speech from the strictures of this statute," also remains intact.  (Defs.' Opening Br. (dkt. #20) 14 (quoting *Bagley*, 164 Wis. 2d at 263-64).)  Whether true or not, not even the *Bagley* decision held that the affirmative defense saved § 29.083 from all First Amendment challenges; rather, the court relied on the language of subsection 3m to bolster

17

its interpretation of the portions of the Act challenged in that case.  Regardless, the court agrees with plaintiffs that the affirmative defense provision does not relieve the Act from judicial review under the First Amendment, for much the same reason that the Seventh Circuit relied on in rejecting a similar argument in *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004).

In *Hodgkins*, the plaintiffs challenged the constitutionality of Indiana's nighttime juvenile curfew law that made it illegal for minors to be out in public after certain times. Defendants argued that the curfew law was constitutional because it contained an affirmative defense for minors arrested while participating in, going to, or returning from an activity protected under the First Amendment.  *Id.* at 1051.  Ultimately, the Seventh Circuit rejected that argument, reasoning that:

> [B]ecause the defense imposes no duty of investigation on the arresting officer, as a practical matter it protects only those minors whom the officer has actually seen participating in protected activity.  This strikes us as a small subset of minors participating in late-night First Amendment activities, and therefore we conclude that the statute reaches a substantial amount of protected conduct. . . . The statute restricts a minor's access to any public forum during curfew hours, and the affirmative defense for participating in First Amendment activities does not significantly reduce the chance that a minor might be arrested for exercising his First Amendment rights. Under these circumstances, a facial challenge is both appropriate and necessary.

*Id.* at 1062, 1064.

Admittedly, the affirmative defense here is different in that the conduct at issue *is* First Amendment speech (observing, recording, reporting on hunting or fishing activities), but it is not exclusively that, or at least has not eliminated conduct that could be

18

interpreted differently by a law enforcement or private citizen as *intended* to interfere with hunting rights.  So, even if the affirmative defense under subsection 3m may *reduce* the risk that individuals participating in the First Amendment activities would be subject to arrest or suit, prosecution or the time and expense of having to mount a defense, it does not preclude examination for overbreadth or vagueness.  *Id.* at 1056.

## B.  Overbreadth

Turning to plaintiffs' two facial challenges, § 29.083 prohibits persons from interfering or attempting "to interfere with lawful hunting, fishing, or trapping with the **intent** to prevent the taking of a wild animal, or intentionally interfere with or intentionally attempt to interfere with" lawful hunting or fishing activity.  The statute further delineates prohibited activities that qualify as intentional interference.  Wis. Stat. § 29.083(2)(a).

Plaintiffs claim that the law "criminalizes a sweepingly broad . . . set of actions," including "approaching a hunter, photographing or videotaping a hunter, or even 'maintaining a visual or physical proximity' to a hunter."  (Compl. (dkt. #1) ¶ 4.)  They further claim that the statute has created an "imminent and credible threat of prosecution for engaging in protected conduct," and the statute chills expression, causing them to "refrain from engaging in protected speech."  (*Id.* ¶ 6.)

As an initial matter, defendants point out that plaintiffs have not even demonstrated that First Amendment rights are implicated here since the statute only regulates conduct that interferes with the lawful activities of hunters and fishers.  (Defs.' Opening Br. (dkt. #20) 28.)  However, the court need not decide this issue because the

19

statute is not unconstitutionally overbroad.

Application of the overbreadth doctrine is "strong medicine." *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973).  As a consequence, courts will not find facial overbreadth if a limiting construction can be applied to the challenged statute and overbreadth claims will be "curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct."  *Id*.  When both conduct and speech are involved, plaintiffs are required to show that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Hill v. Colorado*, 530 U.S. 703, 731 (2000).  In *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968), the Supreme Court laid out a four-factor test to determine whether incidental government limitations on First Amendment activities was justified and permissible: (1) whether the regulation "is within the constitutional power of the Government;" (2) whether it furthers a "substantial government interest;" (3) if that interest is "unrelated to the suppression of free expression;" and (4) if the incidental restriction on freedoms is "no greater than is essential to the furtherance of that interest."  *Id*.

As noted, the State of Wisconsin seeks to regulate non-communicative conduct that involves intentionally impeding or obstructing lawful hunting and fishing activities.   The potential communicative element may result from conduct by individuals who observe, record or report on hunting and fishing activities.  The statute easily meets the first three *O'Brien* requirements.  First, a statute restricting activities *intended* to harass or impede individuals conducting lawful hunting or fishing activities is certainly within the state's power.  Second, the State has a compelling and substantial interest in minimizing conflict

and protecting law-abiding citizens from harassment.  In fact, the Supreme Court has highlighted that while individuals have the right to attempt to communicate with others, they also have the right to be left alone, with such a right to privacy and freedom from harassment being one of the "most comprehensive of rights and the right most valued by civilized men."  *Hill*, 530 U.S. at 716-18.  Third, preventing conflict in the woods, particularly armed conflict, is unrelated to the suppression of free expression.  Defendants also argue that the affirmative defense created in § 29.083(3m) helps insure that the statute's sweep will not include any speech covered by the First Amendment.  (Defs.' Opening Br. (dkt. #20) 14.)  Although an affirmative defense provision is not enough to save a statute from an overbreadth inquiry as the court described above, it does provide guidance as to how it will be interpreted and applied given that the focus is expressly on preventing harassing conduct and *not* on suppressing speech.

The court must then determine whether the incidental restrictions on First Amendment freedoms caused by the statute are not greater than necessary to accomplish its purposes.  Plaintiffs specifically focus on § 29.083(2)(a)2, (2)(a)3, (2)(a)7, and (2)(a)8.  Sections (2)(a)2 and 3 prohibit impeding or obstructing a person engaged in lawful hunting, fishing or trapping, or an activity associated with the same.  Section (2)(a)7 lists a series of activities that, when engaged in over time (two or more acts), show intent to impede or obstruct lawful hunting activities.  Section (2)(a)8 prohibits use of a drone for the same types of activities.  Taken alone, regulation of the activities listed in subsection (2)(a)7.a through d would be overly restrictive.  However, the listed activities, such as approaching a hunter, photographing, etc., are only prohibited when also "intended to

impede or obstruct" another person who is engaged in lawful activities.  Defendants correctly point out that such an intent requirement significantly narrows the scope of the statute and any incidental restrictions on expressive conduct as a result is minimal and permissible within the "legitimate sweep" of the statute.  *See Hill*, 530 U.S. at 732.

### C. Vagueness

Plaintiffs also argue that the statute is unconstitutionally vague.  A statute can be unconstitutionally vague in two ways:  "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.  As in *Hill*, the requirement of intent addresses the first concern.  All activities prohibited by the statute require that the offender *intend* to interfere with the lawful activities of another.  Further, courts have never required that statutes be written with perfect clarity or precision, even when they may restrict expressive activity, *United States v. Williams*, 553 U.S. 285, 304 (2008), and "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications,'" *Hill*, 530 U.S. at 733 (quoting *United States. v. Raines*, 362 U.S. 17, 23 (1960)).  Although the words "impede" or "obstruct" are not clearly defined within the statute, their ordinary meanings are well understood and can be found in any dictionary.  Under *Bagley*, the Wisconsin Court of Appeals has further limited their meaning to physical interference.  *Bagley*, 164 Wis. 2d at 263-65.

The word "proximity" is inherently more subjective and, thus, more problematic.

However, it is not merely maintaining a proximity to a person that is prohibited, it is doing so with the intent to physically impede or obstruct the person's lawful activities. That "narrowing context" and guidance of the so-called First Amendment affirmative defense removes some of the indeterminacy of the word proximity and brings it out of the realm of the purely subjective. *Williams*, 553 U.S. at 306.

As for the risk of arbitrary and discriminating enforcement, the law requires that a warden personally observe or have reasonable grounds to believe that the law has been or is likely to be violated before issuing an order. Although it is not ideal to rely on judicial construction to save a statute from unconstitutionality, as so construed, these guidelines do not appear to encourage arbitrary or discriminatory enforcement, and thus are facially valid. Similarly, with any attempt by private citizens to abuse the right of private action, courts will hopefully again be a brake on such abuse.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #19) is GRANTED.

2) Plaintiffs' motion for summary judgment (dkt. #30) is DENIED.

3) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 10th day of December, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge